DAVIS, Judge.
 

 *41
 
 In this case, a state agency refused to allow an employee to return to work on the ground that he had resigned from his employment. When the employee attempted to file a grievance in which he denied that he had, in fact, resigned, the agency refused to consider the grievance, and the employee filed a petition for a contested case hearing in the North Carolina Office of Administrative Hearings ("OAH"). An administrative law judge ruled in favor of the employee and ordered that he be reinstated to his former position. Because we hold that no legally effective resignation occurred and the agency lacked just cause to terminate his employment, we affirm.
 

 *42
 

 Factual and Procedural Background
 

 In November 2016, Jeffrey Hunt was a career status state employee who worked for the North Carolina Department of Public Safety ("DPS") as a correctional officer at Scotland Correctional Institution. During the summer of 2016, Hunt received two warnings about his tardiness and absenteeism.
 

 On 2 November 2016, Hunt's unit manager, Queen Gerald, asked him to report to the prison before his shift began the following day. At 5:27 p.m. on 3 November 2016, Hunt entered the facility and met with Gerald in an administration area room. Gerald informed him that she was investigating his alleged absence from work on 18 August 2016 and asked him to sign paperwork regarding the absence. Hunt informed Gerald that he would not sign documents regarding an absence for which he had no recollection. He became upset and walked out of the prison through the main door.
 

 Gerald later testified that she heard Hunt say either "I quit" or "I'm quitting" as he walked away. Hunt denied making such a statement. An individual in the vicinity recalled hearing Hunt state: "I'm tired of this s[***]."
 

 Hunt left the prison without "swiping out," and Gerald informed the officer-in-charge that Hunt had resigned. Several minutes later, Hunt tried to re-enter the prison to begin working his shift but was denied entry by the officer-in-charge.
 

 On 4 November 2016, Hunt attempted to contact Superintendent Katy Poole by telephone to discuss his job status but learned that she was on vacation. Poole returned to the office on 7 November 2016, and an assistant superintendent informed her that Hunt had verbally resigned to Gerald.
 

 *260
 
 On 9 November 2016, Poole spoke with Hunt by telephone. Hunt inquired whether "he could return to work." Poole asked him if he was rescinding his resignation to which Hunt responded: "Yes." Poole informed him that she had already accepted his verbal resignation and that she was unwilling to rescind it based on "his history of pending investigations and corrective actions" as well as his behavior toward Gerald during the 3 November 2016 incident.
 

 That same day, Hunt received a letter from DPS confirming that he had resigned on 3 November 2016. The letter did not contain any information about his ability to appeal the separation of his employment. On 21 November 2016, DPS received a letter from Hunt in which he stated
 
 *43
 
 that "at no time during my conversation with Mrs. Gerald (Unit Manager) on 11/3/2016 did I give a resignation."
 

 On 20 January 2017, Hunt submitted a Step 1 grievance letter to DPS's Grievance Intake Office. DPS notified Hunt by letter on 14 February 2017 that his internal grievance could not be processed by the agency because he had resigned from his employment.
 

 On 22 February 2017, Hunt filed a petition for a contested case hearing in OAH. DPS moved to dismiss the petition on 24 March 2017 based on lack of subject matter jurisdiction. In its motion, DPS asserted that Hunt had "failed to exhaust the internal agency grievance process" and "failed to file his grievance within fifteen (15) days of the event pursuant to DPS policy."
 

 On 5 April 2017, Administrative Law Judge Melissa Owens Lassiter (the "ALJ") entered an order denying DPS's motion to dismiss. A hearing was held before the ALJ on 15 June 2017.
 

 On 17 August 2017, the ALJ issued a Final Decision pursuant to N.C. Gen. Stat. § 150B-34 in which she determined that Hunt had "never submitted a verbal statement of resignation to any DPS employee authorized to accept it." The ALJ concluded that DPS had, therefore, acted unlawfully by terminating Hunt's employment without just cause. The ALJ ordered that Hunt be reinstated to the same-or a similar-position held by him prior to his separation and that he receive back pay and attorneys' fees.
 

 On 22 August 2017, Hunt filed a petition for attorneys' fees, which the ALJ granted in an order entered 28 August 2017 (the "Attorneys' Fees Order") awarding him $11,720.00 in attorneys' fees and $20.00 in filing fees. DPS filed a timely notice of appeal as to the 5 April 2017 order, the Final Decision, and the Attorneys' Fees Order.
 

 Analysis
 

 On appeal, DPS contends that the ALJ erred by (1) denying its motion to dismiss Hunt's contested case petition for lack of jurisdiction; (2) concluding that the separation of Hunt from his employment resulted from a discharge rather than a voluntary resignation; and (3) awarding attorneys' fees to Hunt. We address each argument in turn.
 

 I. Subject Matter Jurisdiction of OAH
 

 DPS's first argument is that the ALJ improperly denied DPS's motion to dismiss because OAH did not possess subject matter jurisdiction over Hunt's appeal. DPS contends that jurisdiction was lacking because Hunt
 
 *44
 
 failed to properly follow the mandatory grievance procedure required under North Carolina law before filing a contested case petition in OAH. Hunt, conversely, asserts that because DPS refused to consider his grievance the agency made it impossible for him to follow the grievance procedure.
 

 "Our standard of review of a motion to dismiss for lack of [subject matter] jurisdiction ... is
 
 de novo
 
 ."
 
 Brown v. N.C. Dep't of Pub. Safety
 
 , --- N.C. App. ----, ----,
 
 808 S.E.2d 322
 
 , 324 (2017) (citation and quotation marks omitted),
 
 disc. review denied
 
 ,
 
 370 N.C. 697
 
 ,
 
 811 S.E.2d 589
 
 (2018). "Under
 
 de novo
 
 review, the Court considers the matter anew and freely substitutes its own judgment for that of the trial court."
 

 Id.
 

 at ----,
 
 808 S.E.2d at 324
 
 (citation and quotation marks omitted).
 

 In order to assess DPS's arguments, it is necessary to review the pertinent statutes that apply to these facts. Prior to 2013, the statutory scheme governing personnel actions against State employees was known as the State Personnel Act. "In 2013, our General
 
 *261
 
 Assembly significantly amended and streamlined the procedure governing state employee grievances and contested case hearings, applicable to cases commencing on or after 21 August 2013."
 
 Harris v. N.C. Dep't of Pub. Safety
 
 , --- N.C. App. ----, ----,
 
 798 S.E.2d 127
 
 , 131,
 
 aff'd per curiam
 
 ,
 
 370 N.C. 386
 
 ,
 
 808 S.E.2d 142
 
 (2017). The revised set of statutes remains codified in Chapter 126 of the North Carolina General Statutes but is now called "the North Carolina Human Resources Act."
 

 N.C. Gen. Stat. § 126-35
 
 (a) sets out the procedure by which a career state employee may appeal disciplinary action taken against him and states as follows:
 

 (a) No career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause.
 
 In cases of such disciplinary action, the employee shall, before the action is taken, be furnished with a statement in writing setting forth the specific acts or omissions that are the reasons for the disciplinary action and the employee's appeal rights. The employee shall be permitted 15 days from the date the statement is delivered to appeal to the head of the agency through the agency grievance procedure for a final agency decision.
 
 However, an employee may be suspended without warning for causes relating to personal conduct detrimental to State service, pending the giving of written reasons, in
 
 *45
 
 order to avoid undue disruption of work or to protect the safety of persons or property or for other serious reasons. If the employee is not satisfied with the final agency decision
 
 or is unable, within a reasonable period of time, to obtain a final agency decision
 
 , the employee may appeal to the Office of Administrative Hearings. Such appeal shall be filed not later than 30 days after receipt of notice of the final agency decision. The State Human Resources Commission may adopt, subject to the approval of the Governor, rules that define just cause.
 

 N.C. Gen. Stat. § 126-35
 
 (a) (2017) (emphasis added). "In order for the OAH to have jurisdiction over [a] petitioner's appeal pursuant to N.C. Gen. Stat. §[ ] 126-35 ..., [the] petitioner is required to follow the statutory requirements outlined in Chapter 126 for commencing a contested case."
 
 Nailing v. UNC-CH
 
 ,
 
 117 N.C. App. 318
 
 , 324,
 
 451 S.E.2d 351
 
 , 355 (1994) (citation omitted),
 
 disc. review denied
 
 ,
 
 339 N.C. 614
 
 ,
 
 454 S.E.2d 255
 
 (1995).
 

 N.C. Gen. Stat. § 126-34.01
 
 establishes a grievance procedure that employees are generally required to follow in situations involving a discharge, suspension, or demotion.
 

 Any State employee having a grievance arising out of or due to the employee's employment shall first discuss the problem or grievance with the employee's supervisor, unless the problem or grievance is with the supervisor. Then the employee shall follow the grievance procedure approved by the State Human Resources Commission. The proposed agency final decision shall not be issued nor become final until reviewed and approved by the Office of State Human Resources. The agency grievance procedure and Office of State Human Resources review shall be completed within 90 days from the date the grievance is filed.
 

 N.C. Gen. Stat. § 126-34.01
 
 (2017).
 

 "Once a final agency decision is issued, a potential, current, or former State employee may appeal an adverse employment action as a contested case pursuant to the method provided in
 
 N.C. Gen. Stat. § 126-34.02
 
 ...."
 
 Harris
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at 131
 
 .
 
 N.C. Gen. Stat. § 126-34.02
 
 (a) states, in relevant part, as follows:
 

 (a) Once a final agency decision has been issued in accordance with G.S. 126-34.01, an applicant for
 
 *46
 
 State employment, a State employee, or former State employee may file a contested case in the Office of Administrative Hearings under Article 3 of Chapter 150B of the General Statutes. The contested case must be filed within 30 days of receipt of the final agency decision. ... In deciding cases under this section, the Office of Administrative Hearings may grant the following relief:
 
 *262
 
 (1) Reinstate any employee to the position from which the employee has been removed.
 

 (2) Order the employment, promotion, transfer, or salary adjustment of any individual to whom it has been wrongfully denied.
 

 (3) Direct other suitable action to correct the abuse which may include the requirement of payment for any loss of salary which has resulted from the improper action of the appointing authority.
 

 An aggrieved party in a contested case under this section shall be entitled to judicial review of a final decision by appeal to the Court of Appeals as provided in G.S. 7A-29(a). The procedure for the appeal shall be as provided by the rules of appellate procedure. The appeal shall be taken within 30 days of receipt of the written notice of final decision. A notice of appeal shall be filed with the Office of Administrative Hearings and served on all parties to the contested case hearing.
 

 N.C. Gen. Stat. § 126-34.02
 
 (a) (2017).
 

 This Court recently held that "[w]hile Chapter 126 is silent on the issue, Chapter 150B, the Administrative Procedure Act, specifically governs the scope and standard of this Court's review of an administrative agency's final decision."
 
 Harris
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at 132
 
 . Chapter 150B of the North Carolina General Statutes states, in pertinent part, the following:
 

 The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 *47
 
 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 N.C. Gen. Stat. § 150B-51(b) (2017).
 

 Having reviewed the applicable provisions of the Human Resources Act, we must next apply them to the facts of the present case. DPS contends that OAH lacked jurisdiction over this action for two reasons. First, it argues that
 
 N.C. Gen. Stat. § 126-35
 
 (a) does not apply to Hunt because his employment with DPS ended as a result of his own voluntary resignation rather than from a discharge. Second, it contends that the Step 1 grievance letter submitted by Hunt was untimely in that he was required to submit a grievance within fifteen days of receiving the 9 November 2016 letter confirming his resignation but did not actually do so until 20 January 2017.
 

 Hunt, in turn, asserts that (1) he did not resign and was instead effectively discharged from his employment with DPS; and (2) because he was never provided by DPS with a statement of his appeal rights, the deadline for his filing of a Step 1 grievance was never triggered. Furthermore, he argues, his OAH petition for a contested case hearing was timely because it was filed within thirty days of DPS's l4 February 2017 letter stating its refusal to consider his grievance.
 

 A. Validity of Alleged Resignation
 

 In order to untangle the jurisdictional knot that exists in this case, we must first determine whether Hunt resigned or was discharged. This is so because the nature of the parties' respective obligations under the Human Resources Act hinges on the answer to this question.
 

 Pursuant to 25 N.C.A.C. 1C.1002,
 

 [a]n employee may terminate his services with the state by submitting a resignation
 
 to the appointing authority
 
 .
 

 25 N.C.A.C. 1C.1002 (2016) (emphasis added).
 

 *48
 
 The pertinent findings of fact made by the ALJ on this issue stated as follows:
 

 *263
 
 7. Around 5:27 p.m. on November 3, 2016, [Hunt] reported to work and entered the facility. He and Ms. Gerald met in the lobby of the prison, and then stepped into an administration area room. Ms. Gerald informed [Hunt] that she was investigating [Hunt]'s alleged absence from work on August 18, 2016, and asked [Hunt] to sign a disciplinary form about [Hunt]'s alleged absence from work on that date. [Hunt] advised Ms. Gerald that he did not recall being absent from work on August 18, 2016, and he wasn't going to sign paperwork about an absence for which he had no recollection. [Hunt] became upset, and loud. [Hunt] stated, "I'm tired of this s[***]." [Hunt] made that statement, because he was tired of being accused of wrongdoing, was written up recently ..., and because he was upset that he was being investigated for an absence from work that occurred three months prior. [Hunt] walked through the main door of the prison towards the gatehouse as night shift staff gathered in the lobby for the night shift line-up.
 

 8. Per Ms. Gerald's testimony at hearing, [Hunt] said either "I quit," or "I'm quitting," as he walked out the administration area door. ...
 

 9. In contrast, [Hunt] consistently denied telling Ms. Gerald that "I quit" on November 3, 2016, in [Hunt]'s November 21, 2016 request for a hearing ..., his internal appeal ..., and at the contested case hearing.
 

 10. On November 3, 2016, [Hunt] walked out of the prison through the gatehouse without swiping out at the security check point. Ms. Gerald advised the Officer-in-Charge, Captain Delgado, that [Hunt] had stated he quit, and walked out of the prison facility.
 

 ....
 

 14. While Ms. Gerald was a unit manager, she was not [Hunt]'s supervisor in any capacity, and did not have the authority to accept a resignation from [Hunt], or have the authority to terminate a correctional officer's employment.
 

 ....
 

 *49
 
 17. On November 9, 2016, Superintendent Poole, along with Assistant Superintendent Dean Locklear, telephoned [Hunt], and spoke with [Hunt] via the speaker phone in Ms. Poole's office. Poole advised [Hunt] that Locklear was present and witnessing the call. Poole asked [Hunt] what could she do for him. [Hunt] asked if he could return to work. Poole told [Hunt] that she understood that he had verbally informed Ms. Gerald that he had quit when she questioned him about an internal investigation. [Hunt] asked again if he could return to work. Poole asked [Hunt] if he was requesting her to rescind his resignation, and [Hunt] replied, "Yes." Poole advised [Hunt] that, after reviewing his history of pending investigations and corrective actions, and based on his behavior toward Ms. Gerald when Gerald questioned him about the investigation, she accepted his verbal resignation and would not rescind his resignation. ...
 

 ....
 

 19. On November 10, 2016, Ms. Poole completed a Correctional Officer Separation Information form showing [Hunt]'s effective date of separation as November 4, 2016. She wrote the following as the reason and circumstances surrounding [Hunt]'s separation:
 

 Verbal Resignation
 

 Spoke with Ofr. Hunt on 11/9/16 accepted his verbal resignation. Ofr. Hunt had several ... allegations of misconduct that were being investigated.
 

 ....
 

 22. There was no evidence presented at hearing that [Hunt] resigned, either verbally or otherwise, to any DPS employee who was authorized to accept a resignation from [Hunt] on November 3, 2016. Ms. Gerald was the only person who testified at hearing that [Hunt] stated he was quitting his job. Ms. Gerald was not [Hunt]'s direct supervisor, did not work with [Hunt], and did not have much direct interaction with [Hunt], as Gerald worked the day shift, and [Hunt] worked the night shift. In direct contrast, [Hunt] denied telling Ms. Gerald, "I quit." [Hunt] attempted to return to the workplace on November 3,
 
 *264
 
 2016 before his shift started, but [DPS] refused to allow him to do so
 
 *50
 
 per Capt. Delgado's orders. The fact that [Hunt] knew about Capt. Delgado's orders corroborated [Hunt]'s account that he attempted to return to work on November 3, 2016.
 

 23. At hearing, neither Superintendent Poole nor Asst. Superintendent Locklear testified that [Hunt] said he quit his job during their November 9, 2016 telephone conversation. Instead, [Hunt] informed Poole that he wanted to go back to work.
 

 ....
 

 26. The preponderance of the evidence at hearing proved that [DPS] involuntarily separated [Hunt] from employment on November 3, 2016, as opposed to a voluntary resignation by [Hunt], when Superintendent Poole refused to allow [Hunt] to return to work. Ms. Poole admitted that her "acceptance" of [Hunt]'s "resignation" was based upon [Hunt]'s pending investigation and past corrective actions, and [Hunt]'s behavior toward Ms. Gerald when Gerald questioned him about the investigation. By basing her "acceptance" of [Hunt]'s alleged "resignation" on [Hunt]'s pending investigation and past corrective actions, Ms. Poole's decision to deny [Hunt] to return to work became a disciplinary action against [Hunt]'s employment under NCGS 126-35, without first following the disciplinary procedures required by Chapter 126 of the North Carolina General Statutes. ...
 

 Based on our review of these findings, it is clear that the ALJ did not resolve the factual dispute arising from the testimony of the witnesses as to whether or not Hunt actually stated to Gerald that he was quitting. It is the duty of an ALJ as the finder of fact in OAH proceedings to resolve material facts that are in dispute.
 
 Harris
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at 137
 
 ("As the sole fact-finder, the ALJ has both the duty and prerogative to determine the credibility of the witnesses, the weight and sufficiency of their testimony, to draw inferences from the facts, and to sift and appraise conflicting and circumstantial evidence." (citation and quotation marks omitted) ). We agree, however, with the ALJ's implicit determination that a resolution of this issue was not necessary because even taking as true Gerald's testimony that Hunt stated he was quitting, such a statement would not have amounted to a legally effective resignation.
 

 *51
 
 As noted above, 25 N.C.A.C. 1C.1002 requires that resignations be submitted to the "appointing authority." Our appellate courts have not yet had the opportunity to consider the meaning of the term "appointing authority" as it is used in 25 N.C.A.C. 1C.1002. Moreover, neither the North Carolina Administrative Code nor our General Statutes define the term.
 

 In construing this term, we must first look to the plain meaning of these words.
 
 Britt v. N.C. Sheriffs' Educ. & Training Standards Comm'n
 
 ,
 
 348 N.C. 573
 
 , 576,
 
 501 S.E.2d 75
 
 , 77 (1998) ("When the language of regulations is clear and unambiguous, there is no room for judicial construction, and courts must give the regulations their plain meaning." (citation omitted) ). "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words ...."
 
 Perkins v. Ark. Trucking Servs.
 
 ,
 
 351 N.C. 634
 
 , 638,
 
 528 S.E.2d 902
 
 , 904 (2000) (citation omitted).
 

 The word "appoint" is defined as "to name or select officially for an office, position, etc." Webster's New World College Dictionary 69 (4th ed. 2010). "Authority" is defined as "persons, esp[ecially] in government, having the power or right to enforce orders, laws, etc."
 
 Id.
 
 at 95. Thus, on these facts, we deem it appropriate to construe the phrase "appointing authority" in 25 N.C.A.C. 1C.1002 as referring to the person or persons who have the power to make personnel decisions at Scotland Correctional Institution.
 

 Such a definition is consistent with the usage of this term in Title 25 of the Administrative Code as referring to persons who initiate personnel actions against State employees.
 
 See, e.g.
 
 25 N.C.A.C. 1J.0604 (2016) ("Any employee, regardless of occupation, position or profession may be warned, demoted, suspended or dismissed by
 
 the appointing authority
 
 ." (emphasis added) ).
 

 At the 15 June 2017 hearing, Gerald testified as follows:
 

 *265
 
 [COUNSEL:] ... Do you have the authority, that you know of, to independently hire an employee?
 

 [GERALD:] No, I do not.
 

 [COUNSEL:] Do you have the authority, to your knowledge, to independently fire an employee?
 

 [GERALD:] I do not have that authority either.
 

 ....
 

 *52
 
 [COUNSEL:] ... As a part of this investigation, were you or were you not given the specific authority to accept his resignation?
 

 [GERALD:] No, I was not.
 

 Thus, Gerald's testimony demonstrates that she lacked the authority to make hiring and firing decisions as to employees at the prison. This means that she cannot be deemed to have been the "appointing authority" pursuant to 25 N.C.A.C. 1C.1002, which-in turn-leads to the conclusion that Gerald had no legal authority to accept Hunt's resignation.
 

 Although the parties agree that Poole would qualify as the "appointing authority" based on her position as superintendent at Scotland Correctional Institution, the record is devoid of any indication that Hunt ever informed Poole that he wished to resign. Indeed, to the contrary, the undisputed testimony was that he told her he wished to continue working at the prison during their conversation on 9 November 2016.
 

 Thus, because Gerald had no authority to accept Hunt's resignation, Hunt did not submit a legally effective resignation
 
 even if
 
 Gerald's testimony as to the words he used during their 3 November 2016 encounter is accepted as true. As a result, Hunt's separation from employment constituted an involuntary discharge rather than a voluntary resignation.
 

 B. Compliance With Grievance Process
 

 Having determined that Hunt was discharged by DPS, we must still address whether-as DPS claims-his appeal to OAH was untimely on the ground that his grievance letter was not submitted within fifteen days of the 9 November 2016 letter stating that DPS had accepted his "resignation." In response to this argument, Hunt contends that (1) the fifteen-day deadline for submission of his grievance was never triggered because DPS failed to furnish him with a statement of his appeal rights; and (2) he was not required to complete the grievance procedure because DPS refused to process his grievance.
 

 As stated above,
 
 N.C. Gen. Stat. § 126-35
 
 (a) requires that "[i]n cases of [discharge], the employee shall, before the action is taken, be furnished with a statement in writing setting forth the specific acts or omissions that are the reasons for the disciplinary action and the employee's appeal rights."
 
 N.C. Gen. Stat. § 126-35
 
 (a). Here, DPS does not dispute the fact that it never provided Hunt with a statement of his appeal rights. Instead, it sent Hunt a letter stating that his 3 November 2016 resignation had been accepted by DPS. This letter contained no
 
 *53
 
 information regarding his right to appeal that decision. Approximately twelve days later, Hunt responded by letter to Poole in which he denied ever having resigned. Even after receiving this letter that clearly put DPS on notice of Hunt's disagreement with the notion that he had resigned, DPS still did not inform him of his appeal rights.
 

 Thus, DPS failed to comply with its statutory duty under
 
 N.C. Gen. Stat. § 126-35
 
 (a).
 
 See, e.g.
 
 ,
 
 Nix v. Dep't of Admin.
 
 ,
 
 106 N.C. App. 664
 
 , 668,
 
 417 S.E.2d 823
 
 , 827 (1992) (notification of appeal rights was required where petitioner took disability retirement after being told he would be terminated because his resignation was not voluntary). Accordingly, because no statement of appeal rights was ever sent to Hunt, the fifteen-day time limit set out in
 
 N.C. Gen. Stat. § 126-35
 
 (a) for filing a grievance was never triggered.
 

 This Court has also refused to find that an employee's appeal to OAH was untimely in cases where the agency failed to send a valid notice of appeal rights to the aggrieved employee.
 
 See, e.g.
 
 ,
 
 Early v. Cty. of Durham Dep't of Soc. Servs.
 
 ,
 
 172 N.C. App. 344
 
 , 357,
 
 616 S.E.2d 553
 
 , 562 (2005) (because employee did not receive notice of appeal rights as required by statute, petition for contested
 
 *266
 
 case hearing was timely filed and OAH possessed subject matter jurisdiction over employee's appeal),
 
 disc. review improvidently allowed
 
 ,
 
 361 N.C. 113
 
 ,
 
 637 S.E.2d 539
 
 (2006) ;
 
 Gray v. Dep't of Env't, Health & Nat. Res.
 
 ,
 
 149 N.C. App. 374
 
 , 379,
 
 560 S.E.2d 394
 
 , 398 (2002) (because of incorrect listing of address of OAH in statement of appeal rights given to employee, deadline for filing petition in OAH was not triggered);
 
 Jordan v. N.C. Dep't of Transp.
 
 ,
 
 140 N.C. App. 771
 
 , 774-75,
 
 538 S.E.2d 623
 
 , 625 (2000) (petitioner's request for contested case hearing was timely filed where agency's statement of appeal rights sent to her did not inform her of her right to contest the designation of her position as "exempt policymaking," the procedure for contesting the designation, or the time limit for filing an objection to the designation),
 
 disc. review denied
 
 ,
 
 353 N.C. 376
 
 ,
 
 547 S.E.2d 412
 
 (2001).
 
 [1]
 

 In the present case, Hunt filed his petition in OAH within thirty days of the date he received the letter from DPS refusing to process his grievance. Given DPS's stated refusal to allow Hunt to grieve his discharge, Hunt did not have a duty to take any further steps pursuant to the grievance process. Instead, he was justified in filing his petition in OAH at the
 
 *54
 
 time he did so. Accordingly, we reject DPS's argument that the ALJ erred in denying its motion to dismiss for lack of subject matter jurisdiction.
 

 II. Absence of Just Cause
 

 Having determined that Hunt did not resign and that the ALJ properly concluded OAH possessed subject matter jurisdiction over his appeal, the only remaining question is whether Hunt's discharge was lawful.
 
 N.C. Gen. Stat. § 126-35
 
 states that "[n]o career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause."
 
 N.C. Gen. Stat. § 126-35
 
 (a). In order to discharge a state employee, an agency must demonstrate the employee's "unsatisfactory job performance" or "unacceptable personal conduct." 25 N.C.A.C. 1J.0604(b) (2016).
 

 Our resolution of this issue requires no analysis at all. Neither at the OAH proceeding nor in this appeal has DPS argued that it possessed just cause to terminate Hunt's employment. Instead, its entire argument has consistently hinged on the notion that Hunt voluntarily resigned-a proposition that we have rejected. Thus, we agree with the ALJ that Hunt's discharge was not in accordance with North Carolina law. Accordingly, we affirm the ALJ's Final Decision.
 
 [2]
 

 III. Award of Attorneys' Fees
 

 Finally, DPS argues that the ALJ erred by awarding attorneys' fees to Hunt because the award was issued (1) in a separate order despite the legal requirement that the ALJ "dispose of all issues in a final decision;" and (2) before the expiration of the ten-day period for DPS to respond to Hunt's petition for fees.
 

 As to its first argument, DPS has failed to cite any legal authority specifically prohibiting an ALJ from awarding attorneys' fees by means of a separate order after issuing a final decision on the merits of the employee's appeal. Thus, this argument is overruled.
 

 With regard to DPS's second argument, it cites 25 N.C.A.C. 3.0115, which states, in pertinent part, as follows: "Any application to the administrative law judge for an order shall be by motion, which shall be in writing unless made during a hearing, and must be filed and served upon all parties not less than ten days before the hearing, if any, is to be held either on the motion or the merits of the case.
 
 The nonmoving
 

 *55
 

 party shall have ten days from the date of service of the motion to file a response.
 
 " 26 N.C.A.C. 3.0115 (emphasis added).
 
 *267
 
 In its Final Decision, the ALJ directed Hunt to file a petition for attorneys' fees within ten days. Hunt proceeded to file such a petition on 22 August 2017. Six days later, the ALJ issued an order requiring DPS to pay $11,720.00 in attorneys' fees. Even assuming-without deciding-that the ALJ should have allowed DPS ten days in which to respond to Hunt's petition, DPS has failed to show that it was prejudiced by the ALJ's failure to do so.
 

 Appellate courts do not set aside verdicts and judgments for technical or harmless error. It must appear that the error complained of was material and prejudicial, amounting to a denial of some substantial right. The appellant thus bears the burden of showing not only that an error was committed below, but also that such error was prejudicial-meaning that there was a reasonable possibility that, but for the error, the outcome would have been different.
 

 Faucette v. 6303 Carmel Rd., LLC
 
 ,
 
 242 N.C. App. 267
 
 , 274,
 
 775 S.E.2d 316
 
 , 323 (2015) (internal citations and quotation marks omitted).
 

 In its brief, DPS has not asserted that the amount of attorneys' fees awarded was unreasonable or that the fees were not recoverable under applicable law. Thus, because DPS has failed to show that it was actually harmed by the ALJ's failure to allow ten days for it to respond to Hunt's petition, we dismiss this argument.
 

 Conclusion
 

 For the reasons stated above, we affirm.
 

 AFFIRMED.
 

 Judges DILLON and INMAN concur.
 

 [1]
 

 While the cases cited above were decided before the General Assembly's 2013 statutory amendments, DPS has failed to direct our attention to any provision of the amendments that excuses the failure of an agency to provide an employee with an adequate statement of his right to appeal an adverse personnel action.
 

 [2]
 

 To the extent that DPS's appellate brief seeks to challenge other findings of fact made by the ALJ, none of these additional findings are material to our analysis.